*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

DEPARTMENT OF AGRICULTURE AND
RURAL DEVELOPMENT and ACME
TOWNSHIP,

Plaintiffs-Appellees,

v

KENNETH L. ENGLE and JANET C. ENGLE,

Defendants/Cross-Defendants-
Appellants

and

YUBA ORCHARD COMPANY, LLC,

Defendant/Cross-Plaintiff-Appellee.

FOR PUBLICATION
November 10, 2022
9:30 a.m.

No. 359098
Grand Traverse Circuit Court
LC No. 2020-035493-CZ

Before: MARKEY, P.J., and SAWYER and BOONSTRA, JJ.

PER CURIAM.

Defendants Engle (defendants) appeal by leave granted from an order of the circuit court denying their motion for summary disposition and granting summary disposition to plaintiffs and rescinding the sale of property by defendants to defendant Yuba Orchard Company (Yuba). We affirm.

The trial court provided the following concise statement of the facts underlying this appeal:

The Engles owned two adjoining parcels, consisting of 102.91 total acres, of real property ("Protected Property") in Acme Township. On March 30, 2012, the Engles granted a Conservation Easement to Acme Township, the Michigan Department of Agriculture and Rural Development (MDARD) by and for the State of Michigan, the United States Department of Agriculture by and for the United States of America, and the Natural Resources Conservation Service (NRCS) acting

-1-

on behalf of the Commodity Credit Corporation. The Conservation Easement was conveyed in consideration for $402,900. Under the Conservation Easement, the Engles (hereinafter the "Grantor") retained the right to convey the Protected Property, including the right to sell, lease, mortgage, bequeath, assign or donate the land.[1] However, the Conservation Easement expressly prohibited the Grantor from "dividing, subdividing, partitioning or otherwise creating or permitting separate ownership of the Protected Property."[2]

On April 5, 2019, the Grantor entered into a Purchase Agreement with [Defendant] Yuba Orchard Company ("Yuba"), and on July 12, 2019, conveyed the north parcel of the Protected Property to Yuba in exchange for $328,800. Pursuant to the remedies outlined in the Conservation Easement, MDARD and Acme notified the Grantor on January 10, 2020, of the violation and requested that it be cured. Subsequently, on September 25, 2020, MDARD filed a complaint for declaratory and injunctive relief, entreating the Court to order the Protected Property be returned to single ownership. On February 16, 2021, Yuba filed a Cross Claim against the Grantor asserting breach of contract. The Grantor filed a Motion for Summary Disposition on February 22, 2021, asserting that: (1) the Conservation Easement should not be interpreted to prohibit the sale of one of the parcels; (2) the Court lacks authority to reverse the sale to Yuba; (3) the prohibition against division constitutes an unreasonable restriction on alienation; and (4) laches should bar the Plaintiff's claim. On April 12, 2021, the Court heard oral arguments on the Grantor's motion and took the matter under advisement.

The trial court concluded that the subject easement protected "the entirety of the 102.91 acres" without distinguishing between the two separate tax parcels, and that the prohibition on division or separate ownership was not an unreasonable restraint on alienation. The court further rejected the defendants' invocation of the doctrine of laches. The court additionally decreed that, "Following resolution on appeal, . . . Plaintiff shall record a copy of this Decision and Order and that recording shall act to rescind the Warranty Deed, dated July 12, 2019, from the Grantor to Yuba".

Defendants first argue that the trial court erred in determining that a restraint on alienation was reasonable. We disagree.

This Court reviews a trial court's decision on a motion for summary disposition de novo as a question of law. *Ford Credit Int'l, Inc v Dep't of Treasury*, 270 Mich App 530, 534; 716 NW2d 593 (2006). More particularly, the parties and court below regarded this issue as one of first impression to be decided by the court as a question of law. Questions of law are reviewed de novo. *Rapistan Corp v Michaels*, 203 Mich App 301, 306; 511 NW2d 918 (1994), citing *Cardinal Mooney High Sch v Mich High Sch Athletic Ass'n*, 437 Mich 75, 80; 467 NW2d 21 (1991).

---

[1] Section 5(A).

[2] Section 6(A).

We agree with the trial court that the restraint on alienation at issue here is reasonable. As explained in *LaFond v Rumler*, 226 Mich App 447, 451; 574 NW2d 40 (1997):

> Michigan follows the common-law rule against unreasonable restraints on alienation of property. A restraint on alienation of property is defined as an attempt by an otherwise effective conveyance or contract to cause a later conveyance (1) to be void (disabling restraint), (2) to impose a contractual liability upon the conveyance for conveying in breach of the agreement not to convey (promissory restraint), or (3) to terminate all or part of a conveyed property interest (forfeiture restraint). [Citations omitted.]

At issue here is a disabling restraint, given that the trial court ordered rescission of defendants-appellants' sale of the northern parcel to defendant Yuba.

In *LaFond*, this Court noted generally that, " 'If one's interest in property is absolute, as a fee simple, restriction on his right of alienation is void as repugnant to the grant,' " but that " '[w]here the grantor retains an interest in the property . . . the interest generally will support the imposing of a restriction on alienation.' " *Id.*, quoting *Sloman v Cutler*, 258 Mich 372, 374-376; 242 NW 735 (1932). In this case, the conservation easement left defendants retaining many basic ownership rights over the protected property, while conveying to plaintiffs the rights to insist that uses of the protected property be limited as specified in order to conserve its agricultural or open-space character.

This Court in *LaFond* cited authorities for the "basic premise . . . that nonassignability provisions in land contracts exist for the benefit of the vendor to safeguard performance," and, "[u]nder reasonable circumstances, these restrictions will be enforced solely for that purpose." *LaFond*, 226 Mich App at 455. Accordingly, *LaFond* noted with approval other cases involving land contracts in which the question of reasonableness depended on whether the vendor was vulnerable to suffering waste, or impairment or loss of security, with regard to the subject real property. *Id.* at 453-454, 457.

Defendants argue that the trial court erred by not concerning itself with waste or impairment of security, suggesting that, where there is no finding of such hazards, any attendant restraint on alienation is necessarily unreasonable and thus invalid. Defendants attach too much significance to the inquiry into waste or impairment of security. A vendor performing a land contract obviously retains a dire interest in the subject real property until the sale is completed, and so guarding against waste or other impairments of security is reasonable. The conservation easement underlying this case, however, was not part of any actual or envisioned conveyance of the fee. In short, neither party have much to fear from the other as to concerns of waste or impairment of security.

Moreover, neither *LaFond*, nor the cases it cited, suggested that waste, or impairment of security, were the sole bases for finding a restraint on alienation reasonable. *LaFond*, in fact, noted generally that, after *Sloman*, 258 Mich 372, "the few cases dealing with the issue of restraints on alienation in land contract provisions have taken a more measured approach and have focused on the reasonableness of the restriction at issue." *LaFond*, 226 Mich App at 453. See also *id.* n 2 (noting that the Restatement, Property, § 406, p 2406 (1944), "specifies that a restraint is

permissible if it is reasonable under the circumstances"). For these reasons, the trial court did not err by deciding the question of reasonableness without narrowly tying the inquiry to concerns over waste or impairment of security.

Additionally, these conservation easements serve an important public function. "The social utility of devoting property to conservation, historic preservation, and charitable purposes is strong enough to justify severe restraints on alienation that are reasonably necessary or convenient to assure that the property will be used to carry out the intended purposes." Restatement 3d, Property: Servitudes, § 3.4, comment I, p 448. Accordingly, "Restraints on alienation of conservation servitudes . . . are valid as a matter of common law so long as they are imposed to serve a conservation or other legitimate purpose and are rationally related to accomplishing that purpose." *Id.*

More to the point, § 6(A) of the easement states that the "[g]rantor is prohibited from dividing, subdividing, partitioning or otherwise creating or permitting separate ownership on the Protected Property." And § 1(D) expresses the grantor's willingness to convey, i.e., surrender as part of the deal, "the interest in and the right to use and subdivide land for any and all residential, commercial and industrial purposes and activities which are not incident to agricultural and open space uses" as part of the transaction. In short, defendants agreed to restrict their right to subdivide the parcel.

For these reasons, we agree with the trial court that the restraint on alienation at issue is a reasonable one.

Next, defendants argue that the trial court erred when it interpreted the easement to include an unreasonable restraint on alienation when alternative interpretations were consistent with the easement language and would not render any part of the agreement void. We disagree.

Resolution of this issue requires that we interpret the easement itself. "The language of an express easement is interpreted according to rules similar to those used for the interpretation of contracts." *Wiggins v City of Burton*, 291 Mich App 532, 551; 805 NW2d 517 (2011). This Court reviews de novo issues of contract interpretation. See *Sands Appliance Servs, Inc v Wilson,* 463 Mich 231, 238; 615 NW2d 241 (2000).

Defendants propose as a saving interpretation that the provision be read as applying to division of the two individual tax parcels composing their land, such that each may be sold separately if in its entirety. Defendants do not argue that their interpretation is more faithful to the express terms of the easement, or otherwise tout it as superior to the one the trial court adopted, except that "applying this reasonable interpretation of the Easement would not render the 'multiple owner' language void, as an unreasonable restriction on alienation." But, setting aside that, as discussed above, the trial court correctly concluded that the easement, as interpreted, was not void as an unreasonable restraint on alienation, defendants cite no authority for the proposition that a court has some duty to interpret easement language so as to minimize the burdens on the servient estate.

The trial court explained as follows:

As the language of the Conservation Easement is not ambiguous, it must be enforced as written. The Conservation Easement does not distinguish between the two separate tax parcels, but instead defines the Protected Property as the entirety of the 102.91 acres owned by the Grantor. Thus, the sale of the northern parcel of the Protected Property to Yuba was expressly prohibited by the terms of the Conservation Easement. There can be no alternate interpretation.

We agree with the trial court.

The easement references no subdivisions of the protected property, which itself is defined on the first page as "all or any part or portion of this land" described in the legal description provided with the easement and the certificate of survey. The legal descriptions of three separate areas of land are set forth: the "2012 CONSERVATION EASEMENT" which "contains 98.73 Acres of land," the "FARMSTEAD COMPLEX" (1.22 acres), and the "BUILDING ENVELOPE/FARMSTEAD COMPLEX" (2.96 ACRES). These add up to 102.91 acres. The certificate of survey repeats the legal descriptions, then sets forth a diagram of the premises, which includes a notation, "ENGLE FARM 2011 easement 98.73 AC. Gross (Not including USDA easement or 2 exceptions)." Nothing in the description or diagram implies any recognition of that what defendants now call the northern parcel as having any status rendering it severable from the protected property as a whole.

For these reasons, the trial court did not clearly err by concluding that the protected property consisted of the whole, not two separately recognized parcels.

Defendants next argue that the trial court erred in ordering rescission of the warranty deed from defendants to Yuba. Again, we disagree.

"Rescission abrogates a contract and restores the parties to the relative positions that they would have occupied if the contract had never been made." *Bazzi*, 502 Mich at 409. "Specific performance is a remedy of grace and not of right, resting within the sound discretion of the court, the granting of which depends upon the peculiar circumstances of each case." *Zenko v Boucher*, 60 Mich App 699, 703; 233 NW2d 30 (1975) (quotation marks and citation omitted).

In this case, § 10(F) of the conservation easement states as follows:

The Grantor agrees that the Township's remedies at law for any violation of the terms of this Easement are inadequate and that the Township shall be entitled to injunctive relief, both prohibitive and mandatory, in addition to such other relief to which the Township may be entitled, including specific performance of the terms of this Conservation Easement, without the necessity of proving either actual damages or the inadequacy of otherwise available legal remedies.

The trial court held that, given its conclusion that defendants-appellants "violated the express terms of the Conservation Easement by dividing the Protected Property and creating separate ownership . . . , rescission or nullification of the Warranty Deed to Yuba is warranted in order to restore the Plaintiff and the Grantor to their original positions under the Conservation Easement".

Defendants argue that it is a mischaracterization for the trial court to grant rescission of the deed under the label of specific performance. But defendants' obligations under the easement were principally to refrain from taking certain actions, including subdividing the property. Therefore, in this context, specific performance would include precluding defendants from subdividing the property. Similarly, defendants argue that plaintiffs did not request rescission. But plaintiffs' request to return the property to single ownership would include the remedy of rescinding the deed.

Defendants also cite caselaw for the proposition that rescission of a deed may be appropriate in cases of fraud, mistake of fact, coercion, or undue influence, and protest that the instant case involves none of those. That principle might apply were Yuba wishing to rescind the deed. Yuba might cite a misunderstanding regarding defendants' right to sell only part of the protected property as a mistake of fact, see *Garb-Ko, Inc v Lansing-Lewis Servs, Inc*, 167 Mich App 779, 782; 423 NW2d 355 (1988) (a contract for the sale of commercial real property "may be rescinded because of a mutual mistake of the parties"), or a defect in title, see *Stover v Whiting*, 157 Mich App 462, 468; 403 NW2d 575 (1987) ("Generally speaking, the vendor is under an obligation to convey a merchantable or marketable title. Marketable title is one of such character which should assure the vendee the quiet and peaceful enjoyment of the property, which must be free from encumbrance. A title may be regarded as 'unmarketable' where a reasonably prudent man, familiar with the facts, would refuse to accept title in the ordinary course of business, and it is not necessary that the title actually be bad in order to render it unmarketable."). That is, in light of the easement, title to only a portion of the property would be unmarketable. But as plaintiffs point out, this case is not a dispute between the parties to the deed at issue, but rather a dispute over the rights of plaintiffs, who are strangers to that deed, but parties to the conservation easement with a right to enforce it.

In sum, defendants agreed in the easement to keep the property whole. They violated that agreement by subdividing the property. Legal remedies are inadequate and, therefore, the trial court reasonably turned to the equitable remedy of rescinding the deed and making the property whole again. We note that defendants do not offer any other preferable remedy that would achieve this end.

Defendants' final argument is to attempt to invoke the doctrine of laches. We review de novo the trial court's decision whether to apply the equitable doctrine of laches. *Knight v Northpointe Bank*, 300 Mich App 109, 113; 823 NW2d 439 (2013).

In rejecting defendants' invocation of the doctrine of laches, the trial court noted that the subject easement included the provision, "No delay in enforcement shall be construed as a waiver of the . . . right to enforce the terms of this Conservation Easement at a later date". The court further explained:

> Here, the Grantor improperly attempts to shift the burden to Plaintiff for failing to prevent the transfer, however, the Plaintiff had no duty or obligation to prevent the Grantor from violating the express terms of the Conservation Easement. Additionally, the assertion that Plaintiff had sufficient time to seek an injunction to prevent the transfer is somewhat disingenuous given that the sale occurred less than a month after Plaintiff was made aware of the Grantor's intent. Finally, Grantor

-6-

has failed to adequately demonstrate how it has been prejudiced by Plaintiff's inaction. The Court finds that the situation of neither party has changed materially since June 2019 and the delay of the Plaintiff in seeking relief has not put the Grantor in a worse condition, therefore, the defense of laches is inappropriate.

We agree with the trial court that the quoted clause from the easement precludes application of the doctrine of laches. Similarly, the trial court correctly concludes that plaintiffs had no obligation to prevent defendants from violating the express terms of the easement.[3]

Affirmed. Plaintiffs may tax costs.

/s/ Jane E. Markey
/s/ David H. Sawyer
/s/ Mark T. Boonstra

---

[3] Indeed, this point would seem to suggest the application of the clean-hands doctrine and, by violating the easement, defendants do not come to court with clean hands, thus denying their right to an equitable defense. See *Save Our Downtown v Traverse City*, ___ Mich App ___, slip op at 9; ___ NW2d ___ (No. 359536, issued 10/13/2022).